EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG LAGOON RANCHERIA, a Federally Recognized Indian Tribe,<br><br>        Plaintiff,<br><br>    v.<br><br>STATE OF CALIFORNIA,<br><br>        Defendant.<br>_____/ | No. 09-01471 CW<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket Nos. 80 and 93) |

Over the past several years, Plaintiff Big Lagoon Rancheria (Big Lagoon or the Tribe) has sought to enter into a tribal-state compact with Defendant State of California that permits it to conduct class III gaming. The Tribe alleges that the State has negotiated in bad faith. Big Lagoon moves for summary judgment and an order directing the State to negotiate in good faith, under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701, <u>et seq.</u> The State opposes the motion and cross-moves for summary judgment. The motions were heard on August 12, 2010. Having considered oral argument and the papers submitted by the parties, the Court GRANTS Big Lagoon's motion and DENIES the State's cross-motion.

BACKGROUND

I.   Legal Background

In enacting IGRA in 1988, Congress created a statutory framework for the operation and regulation of gaming by Indian tribes.  See 25 U.S.C. § 2702.  IGRA provides that Indian tribes may conduct certain gaming activities only if authorized pursuant to a valid compact between the tribe and the state in which the gaming activities are located.  See id. § 2710(d)(1)(C).  If an Indian tribe requests that a state negotiate over gaming activities that are permitted within that state, the state is required to negotiate in good faith toward the formation of a compact that governs the proposed gaming activities.  See id. § 2710(d)(3)(A); Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1256-58 (9th Cir. 1994), amended on denial of reh'g by 99 F.3d 321 (9th Cir. 1996).  Tribes may bring suit in federal court against a state that fails to negotiate in good faith, in order to compel performance of that duty, see 25 U.S.C. § 2710(d)(7), but only if the state consents to such suit.  See Seminole Tribe v. Florida, 517 U.S. 44 (1996).  The State of California has consented to such suits.  See Cal. Gov't Code § 98005; Hotel Employees & Rest. Employees Int'l Union v. Davis, 21 Cal. 4th 585, 615 (1999).

IGRA defines three classes of gaming on Indian lands, with a different regulatory scheme for each class.  Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming."  25 U.S.C. § 2703(8).  Class III gaming includes, among other things, slot machines, casino games, banking card games, dog racing and lotteries.  Class III gaming is lawful only

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

1   where it is (1) authorized by an appropriate tribal ordinance or

2   resolution; (2) located in a state that permits such gaming for any

3   purpose by any person, organization or entity; and (3) conducted

4   pursuant to an appropriate tribal-state compact. See id.

5   § 2710(d)(1).

6        IGRA prescribes the process by which a state and an Indian

7   tribe are to negotiate a gaming compact:

8        Any Indian tribe having jurisdiction over the Indian
         lands upon which a class III gaming activity is being
9        conducted, or is to be conducted, shall request the State
         in which such lands are located to enter into
10       negotiations for the purpose of entering into a
         Tribal-State compact governing the conduct of gaming
11       activities.  Upon receiving such a request, the State
         shall negotiate with the Indian tribe in good faith to
12       enter into such a compact.

13  Id. § 2710(d)(3)(A).

14       IGRA provides that a gaming compact may include provisions

15  relating to

16       (i) the application of the criminal and civil laws and
         regulations of the Indian tribe or the State that are
17       directly related to, and necessary for, the licensing and
         regulation of such activity;

18
         (ii) the allocation of criminal and civil jurisdiction
19       between the State and the Indian tribe necessary for the
         enforcement of such laws and regulations;

20
         (iii) the assessment by the State of such activities in
21       such amounts as are necessary to defray the costs of
         regulating such activity;

22
         (iv) taxation by the Indian tribe of such activity in
23       amounts comparable to amounts assessed by the State for
         comparable activities;

24
         (v) remedies for breach of contract;
25
         (vi) standards for the operation of such activity and
26       maintenance of the gaming facility, including licensing;
         and

27

28                                    3

United States District Court
For the Northern District of California

(vii) any other subjects that are directly related to the operation of gaming activities.

Id. § 2710(d)(3)(C).

If a state fails to negotiate in good faith, the Indian tribe may, after the close of the 180-day period beginning on the date on which the Indian tribe asked the state to enter into negotiations, initiate a cause of action in a federal district court. See id. § 2710(d)(7)(A)(i). In such an action, the tribe must first show that no tribal-state compact has been entered into and that the state failed to respond in good faith to the tribe's request to negotiate. See id. § 2710(d)(7)(B)(ii). Assuming the tribe makes this prima facie showing, the burden then shifts to the state to prove that it did in fact negotiate in good faith. See id.[1] If the district court concludes that the state failed to negotiate in good faith, it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period." Id. § 2710(d)(7)(B)(iii).

---

[1]Specifically, IGRA provides:

(i)  An Indian tribe may initiate a cause of action [to compel the State to negotiate in good faith] only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).
(ii)  In any action [by an Indian tribe to compel the State to negotiate in good faith], upon the introduction of evidence by an Indian tribe that—
(I)  a Tribal-State compact has not been entered into under paragraph (3), and
(II)  the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,
the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

25 U.S.C. § 2710(d)(7)(B).

1    If no compact is entered into within the next sixty days, the

2    Indian tribe and the state must then each submit to a court-

3    appointed mediator a proposed compact that represents their last

4    best offer.  See id. § 2710(d)(7)(B)(iv).  The mediator chooses the

5    proposed compact that "best comports with the terms of [IGRA] and

6    any other applicable Federal law and with the findings and order of

7    the court."  See id.  If, within the next sixty days, the state

8    does not consent to the compact selected by the mediator, the

9    mediator notifies the Secretary of the Interior, who then

10   prescribes the procedures under which class III gaming may be

11   conducted.  See id. § 2710(d)(7)(B)(vii).

12   II.  Prior Proceedings

13        This is the second action concerning Big Lagoon's efforts to

14   secure a tribal-state compact for class III gaming.  The first

15   lawsuit, Big Lagoon Rancheria v. California (Big Lagoon I), Case

16   No. 99-4995 CW (N.D. Cal.), related to the parties' earlier

17   negotiations, which commenced after the Tribe's March, 1998 request

18   to enter into a compact.  In Big Lagoon I, as here, the Tribe

19   alleged that the State did not negotiate in good faith.

20        Because the background of that case is explained in detail in

21   the Court's March 18, 2002 Order on Big Lagoon's second motion for

22   summary judgment, it will not be repeated here in its entirety.

23   The Court recounts, however, facts relevant to the Tribe's current

24   action.

25        On October 5, 2001, Big Lagoon filed a motion for summary

26   judgment and sought an order compelling the State to negotiate in

27   good faith.  The Tribe opposed the State's insistence that it enter

28

United States District Court
For the Northern District of California

1   into a "side letter agreement," under which the Tribe would not

2   have commenced construction of a casino or conducted class III

3   gaming until it had "completed all environmental reviews,

4   assessments, or reports, and received approval for its construction

5   by the State through its agencies."  Order of Mar. 18, 2002, at 8,

6   Big Lagoon I.  The Court held that, under IGRA, the State "may not

7   impose its environmental and land use regulations on the Tribe

8   absent authority from Congress."  Id. at 12-13.  However, the State

9   could negotiate for compliance with such regulations "to the degree

10  to which they are 'directly related' to the Tribe's gaming

11  activities or can be considered 'standards' for the operation of

12  and maintenance of the Tribe's gaming facility under [25 U.S.C.]

13  § 2710(d)(3)(C)(vi) and (vii)."  Id. at 15.  Concerning the side

14  letter agreement, the Court stated,

15          [T]he State's continued insistence that the Tribe agree
            to this broad side letter agreement would constitute bad
16          faith.  The State may in good faith ask the Tribe to make
            particular concessions that it did not require of other
17          tribes, due to Big Lagoon's proximity to the coastline or
            other environmental concerns unique to Big Lagoon.  The
18          State could demonstrate the good faith of its bargaining
            position by offering the Tribe concessions in return for
19          the Tribe's compliance with requests with which the other
            tribes were not asked to comply.  However, the State may
20          not in good faith insist upon a blanket provision in a
            tribal-State compact with Big Lagoon which requires
21          future compliance with all State environmental and land
            use laws, or provides the State with unilateral authority
22          to grant or withhold its approval of the gaming facility
            after the Compact is signed, as it proposed in the side
23          letter agreement.

24  Id. at 19.  The Court denied without prejudice the Tribe's motion

25  for summary judgment, concluding that a determination of bad faith

26  was premature "due to the novelty of the questions at issue

27  regarding good faith bargaining under IGRA" and because the

28                                      6

"Court's March 22, 2000 Order gave the State reason to believe that it could negotiate on environmental and land use issues." Id. The parties were ordered to resume negotiations consistent with the guidance provided in the Court's Order.

On April 2, 2003, frustrated by the pace of the negotiations, Big Lagoon filed another motion for summary judgment. The State had offered an alternative proposal, under which it would enter into a compact with the Tribe in exchange for, among other things, a requirement that the Tribe site its gaming facility on a twenty-five-acre parcel that it would purchase from the State. The Court was inclined to grant Big Lagoon's motion. However, in an order of June 11, 2003, the Court stayed its ruling and, instead, set a deadline by which the parties were to finalize a draft compact based on the State's new proposal. The parties failed to meet the deadline.

On August 4, 2003, the Court lifted the stay on its decision and denied Big Lagoon's motion without prejudice. Because the delay was attributable to demands made by the Tribe, not the State's intransigence, the Court directed the parties to continue negotiations.

Negotiations continued through 2005 and, in the intervening period, the governorship changed hands. On August 17, 2005, the Tribe and the Schwarzenegger administration entered into a settlement agreement, under which Big Lagoon would have been granted a tribal-State compact permitting the Tribe to operate, along with the Los Coyotes Band of Cahuilla and Cupeño Indians, a joint gaming operation in Barstow, California. Under this so-

7

Case4:09-cv-01471-CW  Document101  Filed11/22/10  Page8 of 26

United States District Court
For the Northern District of California

1   called "Barstow Compact," Big Lagoon agreed not to establish gaming

2   facilities on its own lands.  The execution of the settlement

3   agreement and the Barstow Compact, however, was contingent upon

4   several conditions, one of which was ratification of the Barstow

5   Compact by the California Legislature.

6        The Legislature did not ratify the Barstow Compact in either

7   its 2006 or 2007 legislative sessions.  Accordingly, by its terms,

8   the Barstow Compact became null and void in September, 2007.

9   III.  Current Round of Negotiations

10       As contemplated by the settlement agreement, Big Lagoon and

11  the State began a new round of negotiations.  On September 18,

12  2007, the Tribe sent a letter to the State, indicating its desire

13  to conduct class III gaming "on the trust lands that constitute the

14  Big Lagoon Rancheria contiguous to Big Lagoon along the coastline

15  in Humboldt County."  Engstrom Decl., Ex. 2.

16       On November 19, 2007, the State sent a draft compact to the

17  Tribe.  In an accompanying letter, the State expressed an interest

18  in siting the Tribe's gaming facilities on off-reservation lands.

19  The draft compact contained a section on "Revenue Contribution,"

20  requiring the Tribe to pay the State a portion of its annual net

21  win.  Engstrom Decl., Ex. 3 at BL000684.  The draft compact also

22  included a provision for "Exclusivity," which provided that, if the

23  State were to "authorize any person or entity other than an Indian

24  tribe with a federally approved Class III Gaming compact to operate

25  Gaming Devices within" the Tribe's "core geographic market," and

26  such person or entity were to so operate, the Tribe could, subject

27  to restrictions, cease to make the payments required by the revenue

28                                    8

<div style="writing-mode: vertical">United States District Court<br>For the Northern District of California</div>

1   contribution provision discussed above.  Id. at BL000688.  All

2   subsequent compact proposals contained a requirement for revenue

3   contribution and a provision for exclusivity.

4       On January 31, 2008, the State sent Big Lagoon another

5   proposal, offering the Tribe a compact in exchange for, among other

6   things, siting its gaming operations based on the State's

7   preferences.  The State's preferred option was for the Tribe to

8   construct its facilities at the "Highway Site," which was "located

9   adjacent to the highway within five miles of the Big Lagoon

10   Rancheria."  Engstrom Decl., Ex. 4 at BL000792.  Under the

11   proposal, the Tribe would have been required to develop at the

12   Highway Site, unless precluded from doing so.  In other words, the

13   Tribe would have been able to develop on its lands only if, for

14   some reason, it could not develop the Highway Site.  The State's

15   preferred on-reservation alternative was the so-called "Five-

16   Acre/Rancheria Site."  This plan would allow "a 250-device casino"

17   on a nine-acre parcel comprising the Tribe's "original rancheria,"

18   "a 50-room casino-related hotel . . . on the Tribe's post-1988

19   trust lands" and various support facilities located on an adjacent

20   five-acre parcel that the Tribe owned in fee.  Id. at BL000793.  In

21   the event that the Tribe could not gain regulatory approval for use

22   of the five-acre parcel, it could build on what the State called

23   the "Rancheria Site."  This alternative would allow a "175-device

24   casino on the 9 Acre Parcel and a 50-room hotel on the 11 Acre

25   Parcel along with any other related facilities . . . ."  Id. at

26   BL000794.  If the casino had been sited on either the Five-

27   Acre/Rancheria or Rancheria sites, which were adjacent to

28

<div style="text-align: center">9</div>

environmentally-sensitive lands, the Tribe would have been required to comply with additional "Development Conditions."  See id., App. A.

The January, 2008 proposal also provided that the Tribe would pay the State a share of its net win, ranging from twelve to twenty-five percent.  The actual rate would depend on the Tribe's annual net win and the location of the casino.  In exchange for the Tribe's payments, the State would provide "geographic exclusivity of 50 miles."  Engstrom Decl., Ex. 4 at BL000794.

On March 21, 2008, through its counsel, Big Lagoon sent a letter to the State, which rejected any siting of its proposed gaming operations on locations "other than the Tribe's existing trust lands."  Engstrom Decl., Ex. 6 at BL000904.  The Tribe proposed that any compact should include a 350-device casino, a 120-room hotel and "all amenities (restaurants, spa, meeting rooms, etc.) associated with a modestly-sized, upscale facility."  Id. The Tribe also suggested that any compact "should provide for . . . future expansion."  Id.

On May 2, 2008, the State sent the Tribe a letter, which reiterated its desire to site any gaming operation on a location other than the Tribe's lands.  The State emphasized its interest in "preserving and protecting, for present and future generations, environmentally significant State resources located adjacent to the rancheria."  Engstrom Decl., Ex 7 at BL000907.  The State then proposed a compact that would have permitted the Tribe to operate a 99-device casino on the nine-acre parcel within its original rancheria, and a 50-room hotel on the eleven-acre parcel on its

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

post-1988 trust lands.  The proposed compact also provided for
geographic exclusivity of fifty miles and payments to the State,
ranging from ten to twenty-five percent, depending on the Tribe's
annual net win.

On October 6, 2008, Big Lagoon, through its counsel, sent a
letter to the State, expressing its belief that the geographical
exclusivity offered by the State was "meaningless" because its
lands were "in an area in which non-Tribal gaming is unlikely to
proliferate . . . ."  Engstrom Decl., Ex. 8 at BL000912.  And,
although it had considered making payments to the State in earlier
proposals, it stated that it was "no longer willing to pay the
State what simply amounts to a tax . . . ."  Id. at BL000913.  Big
Lagoon stated that any final compact would have to include the
right to operate up to 350 gaming devices and a hotel with up to
100 rooms.  The Tribe also proposed that any payments it made would
have to be deposited solely into the Revenue Sharing Trust Fund
(RSTF).  The RSTF contains "moneys derived from gaming device
license fees that are paid . . . pursuant to the terms of
tribal-state gaming compacts for the purpose of making
distributions to noncompact tribes."  Cal. Gov't Code § 12012.75;
see also In re Gaming Related Cases (Coyote Valley II), 331 F.3d
1094, 1110 (9th Cir. 2003).  Big Lagoon stated that, if the parties
did not execute a final agreement by November 7, 2008, it would
resume its litigation in this Court.

On October 31, 2008, the State sent a letter to the Tribe,
which contained its final proposal.  The State indicated that it
was open to siting a 349-device casino on the Tribe's lands.

11

1  However, because of such a facility's proximity to "a State

2  ecological reserve, a State recreation area, and . . . [a] lagoon,"

3  the State proposed that the compact contain environmental

4  mitigation measures.  Engstrom Decl., Ex. 9 at BL000918.

5      The State also proposed that the Tribe make quarterly payments

6  of fifteen percent of its net win; unlike the State's earlier

7  offers, the Tribe's payments would have been based on a flat rate.

8  The State explained that the fifteen-percent rate was consistent

9  with what it received from other tribes.  The State also responded

10  that its request for "general fund revenue sharing" was in exchange

11  for providing the Tribe with "the exclusive right to conduct gaming

12  in the most populous state in the union."  Id. at BL000916-17.

13  According to the State, the Tribe would "receive significant value

14  from a compact that provides it with a class III gaming monopoly"

15  and that it was only fair for the State to receive "something of

16  value in return."  Id. at BL000916.  The State also offered to

17  permit the Tribe to continue receiving distributions from the RSTF,

18  so long as Big Lagoon operated less than 349 devices and did not

19  use RSTF funds to defray costs "arising out of, connected with, or

20  relating to any gaming activities."  Id.

21      The parties failed to execute a compact.  On April 3, 2009,

22  the Tribe filed its complaint, alleging that the State failed to

23  negotiate in good faith, in violation of IGRA.

                              LEGAL STANDARD

25      Summary judgment is properly granted when no genuine and

26  disputed issues of material fact remain, and when, viewing the

27  evidence most favorably to the non-moving party, the movant is

28
                                  12

1  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

2  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

3  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

4  1987).

5                              DISCUSSION

6  I.   State's Requests for General Fund Revenue Sharing

7       Big Lagoon asserts that the State's failure to negotiate in

8  good faith is evidenced by the State's requests for general fund

9  revenue sharing,[2] insistence that the Tribe comply with various

10 environmental and land use regulations and recommendations that the

11 Tribe site its gaming facility off of its tribal lands.

12      As noted above, in its last offer, the State proposed a

13 tribal-State compact that required the Tribe to pay, on a quarterly

14 basis, fifteen percent of its net win into the State's general

15 fund.  Throughout the negotiation process, the State insisted that

16 the Tribe share its revenue.  The Tribe claims this is prima

17 facie evidence of bad faith.

18      Under IGRA, "a state may, without acting in bad faith, request

19 revenue sharing if the revenue sharing provision is (a) for uses

20 'directly related to the operation of gaming activities' in

21 § 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and

22 (c) not 'imposed' because it is bargained for in exchange for a

23 'meaningful concession.'"  Rincon Band of Luiseño Mission Indians

24

_____

25      [2] The proposed tribe-State compact does not identify the
   State's general fund to be the beneficiary of the Tribe's payments.
26 However, throughout its papers, the State acknowledges that such
   revenue contributions would be paid into the State's general fund.
27 See, e.g., State's Am. Opp'n 6.

28                                13

United States District Court
For the Northern District of California

1    v. Schwarzenegger, 602 F.3d 1019, 1033 (9th Cir. 2010) (citing

2    Coyote Valley II, 331 F.3d at 1111-15) (emphasis in original).

3        Here, the State's demands for general fund revenue sharing

4    constitute evidence of bad faith.  The State does not dispute that

5    its requests were non-negotiable.  Indeed, throughout its

6    communications to the Tribe and briefs on this motion, the State

7    asserted its entitlement to seek revenue sharing as consideration

8    for a gaming compact.  See, e.g., Engstrom Decl., Ex. 9 at

9    BL000916.  Because the State's insistence on general fund revenue

10   sharing amounts to a demand for direct taxation of Big Lagoon, the

11   burden shifts to the State to prove that it nonetheless negotiated

12   in good faith.  See Rincon, 602 F.3d at 1030; 25 U.S.C.

13   § 2710(d)(7)(B)(ii).

14       The State makes no effort to do so.  It does not argue that

15   the revenue sharing provision is directly related to the operation

16   of gaming activities.  Nor does it contend that general fund

17   revenue sharing is consistent with the purposes of IGRA.  Instead,

18   the State argues that Rincon was wrongly decided and that, even if

19   the decision stands,[3] it is not applicable to this case.

20       As the State acknowledges, the Court is bound to follow

21   Rincon, see Wedbush, Noble, Cooke, Inc. v. SEC, 714 F.2d 923, 924

22   (9th Cir. 1983), and the State fails to demonstrate that Rincon's

23

24       [3] In Rincon, the State petitioned the Ninth Circuit for a
     rehearing en banc, which was denied.  However, the Ninth Circuit
25   stayed the issuance of its mandate pending the filing of the
     State's petition for a writ of certiorari with the United States
26   Supreme Court.  The Supreme Court has not yet ruled on the State's
     petition and, accordingly, the Ninth Circuit's stay remains in
27   effect.  Fed. R. App. P. 42(d)(2)(B).

28                                    14

1    teachings are not applicable here.  In that case, the Rincon tribe

2    desired to expand its gaming operations, which required it to

3    renegotiate provisions of its 1999 compact with the State.  602

4    F.3d at 1024.  Similar to its negotiating position with Big Lagoon

5    here, the State offered to allow the tribe to expand its gaming

6    operations, "but only if Rincon would agree to pay the State 15% of

7    the net win on the new devices, along with an additional 15% fee

8    based on Rincon's total 2004 net revenue."  _Id._  As here, the State

9    offered the tribe an "'exclusivity provision.'"  _Id._

10       Applying the IGRA burden-shifting framework described above,

11   the Ninth Circuit held that the State did not rebut the tribe's

12   _prima facie_ showing that the demand for general fund revenue

13   sharing evidenced a failure to negotiate in good faith.  In

14   particular, the court concluded that contributions to the State's

15   general fund were not, as required by IGRA, "directly related to

16   the operation of gaming activities."  _Id._ at 1033 (citing 25 U.S.C.

17   § 2710(d)(3)(C)(vii)).  The court also held that the State's demand

18   was not consistent with the purposes of IGRA.  _Rincon_, 602 F.3d at

19   1035-36.  Finally, the Ninth Circuit held that the State did not

20   offer a "meaningful concession" in exchange for its demand of

21   revenue.  _Id._ at 1036.  The court explained that Proposition 1A,

22   which amended the State's constitution to "authorize tribal gaming

23   in California" and "effectively gave tribes a state constitutional

24   monopoly over casino gaming in California," _id._ at 1023, rendered

25   the State's offer of exclusivity meaningless.  The Ninth Circuit

26   explained that

27       in the current legal landscape, "exclusivity" is not a

28                                         15

United States District Court
For the Northern District of California

new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law.  Moreover, the benefits conferred by Proposition 1A have already been used as consideration for the establishment of the RSTF and SDF [Special Distribution Fund[4]] in the 1999 compact. . . .  The State asserts that it would be unfair to permit Rincon to keep the benefit of exclusivity conferred by Proposition 1A without holding the tribe to an ongoing obligation to periodically acquiesce in some new revenue sharing demand.  While we do not hold that no future revenue sharing is permissible, it is clear that the State cannot use exclusivity as new consideration for new types of revenue sharing since it and the collective tribes already struck a bargain in 1999, wherein the tribes were exempted from the prohibition on gaming in exchange for their contributions to the RSTF and SDF.

Id. at 1037 (citations omitted).

The State attempts to distinguish Rincon by arguing that, unlike the tribe in that case, the Tribe here has not offered anything for the rights granted under Proposition 1A.  The State appears to assert that Proposition 1A exclusivity remains a

---

[4] The tribes' payments to the SDF may used by the State for the following purposes:

(a) grants for programs designed to address gambling addiction;

(b) grants for the support of state and local government agencies impacted by tribal gaming;

(c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact;

(d) payment of shortfalls that may occur in the RSTF; and

(e) "any other purposes specified by the legislature."

Coyote Valley II, 331 F.3d at 1106; see generally Cal. Gov't Code § 12012.85.  The Coyote Valley II court countenanced the State's request for payments to the SDF because the State is restricted on what it "can do with the money it receives from the tribes pursuant to the SDF provision, and all of the purposes to which such money can be put are directly related to tribal gaming."  Id. at 1114.

16

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    meaningful concession as to Big Lagoon because the Tribe has not

2    previously offered consideration for it.  This argument is not

3    persuasive.  The State does not point to any provision of the

4    California Constitution or indicator of legislative intent that

5    suggests Big Lagoon is required to offer some form of consideration

6    before exercising rights to which it is already entitled.  Further,

7    this argument addresses neither the relationship between general

8    fund revenue sharing and gaming operations nor whether such revenue

9    sharing is consistent with the purposes of IGRA; as explained

10   above, both must be established to rebut a <u>prima facie</u> showing of a

11   failure to negotiate in good faith.

12       The State correctly asserts that, under <u>Rincon</u> and <u>Coyote</u>

13   <u>Valley II</u>, it may, in good faith, bargain for some form of revenue

14   sharing.  However, that it could have done so does not mean it

15   actually did so here.  As explained above, the State can establish

16   that it negotiated in good faith, notwithstanding revenue sharing

17   demands, if it satisfies the requirements set forth in <u>Rincon</u>.  The

18   State has not done so.  Further, the <u>Coyote Valley II</u> court, which

19   approved of revenue sharing payments by tribes, addressed payments

20   into the RSTF and SDF, not into the general fund.  <u>Rincon</u> rejected

21   general fund contributions, which are at issue here.

22       The State offers two additional arguments to justify the

23   propriety of its negotiating position, neither of which are

24   persuasive.  First, it maintains that it negotiated in good faith

25   because its revenue sharing requests were consistent with the terms

26   to which the Tribe agreed in the Barstow Compact.  However, during

27   the post-Barstow negotiations, the Tribe rejected general fund

28                                      17

United States District Court
For the Northern District of California

revenue sharing.  The State does not argue -- nor can it -- that it relied on the Tribe's prior position during the most recent round of negotiations.  In addition, as the State emphasizes elsewhere, its subjective beliefs are not relevant as to whether it negotiated in good faith.  See Rincon, 602 F.3d at 1041.

The State also argues it negotiated in good faith based on the United States Supreme Court's February, 2009 decision in Carcieri v. Salazar, 129 S. Ct. 1058 (2009).  There, the Supreme Court concluded that the Indian Relocation Act (IRA) authorizes the Secretary of the Interior to acquire land in trust for a tribe only if the tribe was "under the federal jurisdiction of the United States when the IRA was enacted in 1934."  129 S. Ct. at 1068.  The State maintains that Big Lagoon is not such a tribe and that, under Carcieri, the Tribe's eleven-acre parcel was unlawfully acquired by the Secretary of the Interior.  Thus, the State reasons, it negotiated in good faith because the public interest would be disserved by siting a gaming facility on land that was "unlawfully acquired in trust for Big Lagoon . . . ."  State's Am. Opp'n 13.

At the hearing on the motions, the State acknowledged the flaws in this argument.  The record of negotiations contains no evidence that the State bargained based on an argument that some of the Tribe's lands were unlawfully acquired.  Indeed, the State sent its last proposal to the Tribe in October, 2008, almost four months before the Supreme Court issued its decision in Carcieri.  The State cannot establish that it negotiated in good faith through a post hoc rationalization of its actions.  Cf. Arrington v. Daniels, 516 F.3d 1106, 1113 (9th Cir. 2008) (rejecting counsel's post hoc

explanations of agency action as a "substitute for the agency's own articulation of the basis for its decision").  At the very least, the State's after-the-fact challenge to the status of some of the Tribe's lands runs afoul of <u>Rincon</u>'s teaching that "good faith should be evaluated objectively based on the record of negotiations."  602 F.3d at 1041.

Furthermore, the State does not dispute that the Tribe is currently recognized by the federal government or that it has lands on which gaming activity could be conducted.  On these facts, the Tribe is entitled to good faith negotiations with the State toward a gaming compact.  25 U.S.C. § 2710(d)(3)(A).  That the status of the eleven-acre parcel may be in question does not change this result.

Finally, related to its public interest argument, the State maintains that the Court should deny the Tribe relief because it would be inequitable to require the State to negotiate for a compact involving lands that may have been unlawfully acquired in trust.  However, the State offers no authority for the Court to act in equity in disregard of congressional intent.  IGRA makes clear that, once a court finds that a state has failed to negotiate for a compact in good faith, "the court <u>shall</u> order the State and the Indian Tribe to conclude such a compact within a 60-day period." 25 U.S.C. § 2710(d)(7)(b)(iii) (emphasis added).

The State's newfound concerns need not go unaddressed.  IGRA provides a procedure by which the Secretary of the Interior can disapprove of tribal-state compacts.  <u>See</u> 25 U.S.C. § 2710(d)(8)(B).  The Secretary could reject a compact between Big

United States District Court
For the Northern District of California

19

Lagoon and the State if he were to determine that it violated any provision of IGRA, "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands" or "the trust obligations of the United States to Indians." <u>Id.</u>

Because the status of the Tribe and its eleven-acre parcel has no bearing on whether the State negotiated in good faith, the State's request for a continuance pursuant to Federal Rule of Civil Procedure 56(f) is denied.  In addition, the Court denies the State's request to stay the proceedings in this case pending the United States Supreme Court's decision on its petition for a writ of certiorari in <u>Rincon</u>.  The State does not establish that a discretionary stay is warranted.  <u>See</u> <u>Lockyer v. Mirant Corp.</u>, 398 F.3d 1098, 1110 (9th Cir. 2005) (providing factors to be considered in determining the propriety of a discretionary stay under <u>Landis v. N. Am. Co.</u>, 299 U.S. 248 (1936)).

Accordingly, the Tribe is entitled to summary judgment.  The State's cross-motion for summary judgment is denied.

II.   State's Requests for Environmental Mitigation Measures

Big Lagoon maintains that, under IGRA, environmental mitigation is not a permissible subject for the compacting process and that the State's negotiating position amounted to an imposition of such measures, evincing the State's lack of good faith.

The State's requests for compliance with environmental mitigation measures are not new.  During the negotiations at issue in <u>Big Lagoon I</u>, the State made similar requests, to which the Tribe objected.  As it does here, the Tribe proffered statements by members of Congress indicating there was no congressional intent

United States District Court
For the Northern District of California

1  that compacts include environmental and land use regulation.  <u>See</u>

2  Order of Mar. 18, 2002 at 15, <u>Big Lagoon I</u> (quoting statement of

3  Representative Tony Coelho, 134 Cong. Rec. H8155 (Sept. 26, 1988)).

4  The Court rejected the Tribe's argument that environmental and land

5  use issues were outside the scope of permissible topics under IGRA.

6  With regard to the legislators' comments, the Court stated that

> a better reading of the legislative history is that it
> warns against allowing States to regulate tribal activity
> broadly under the guise of negotiating provisions on
> subjects that directly relate to gaming activity and may
> be included in a tribal-State compact under
> § 2710(d)(3)(C).  In other words, the legislative history
> does not state that issues such as environmental
> protection and land use may <u>never</u> be included in a
> tribal-State compact, but only that the State may not use
> the compacting process as an excuse to regulate these
> areas more generally.

13  <u>Id.</u> at 16 n.5.

14    Big Lagoon now argues that <u>Rincon</u> requires reconsideration of

15  the Court's earlier conclusion.  Specifically, the Tribe points to

16  a footnote in <u>Rincon</u>, in which the Ninth Circuit cites Senator

17  Daniel Inouye's statement that Congress did not intend "that the

18  compacting methodology be used in such areas such as taxation,

19  water rights, environmental regulation, and land use . . . ."

20  <u>Rincon</u>, 602 F.3d at 1029 n.10 (quoting 134 Cong Rec. S12643-01, at

21  S12651 (Sept. 15, 1988)).  From this citation, the Tribe

22  extrapolates that "<u>Rincon</u> specifically holds" that Congress did not

23  intend that environmental regulation and land use be within the

24  scope of compact negotiations.  Big Lagoon's Reply 5.

25    The Ninth Circuit did not, by quoting a senator's statement in

26  a footnote, categorically forbid negotiations over environmental

27  mitigation measures.  It is true that the footnote to which the

28

United States District Court
For the Northern District of California

Tribe refers pertained to the Rincon court's discussion of permissible topics of negotiation under IGRA.  However, as stated above, comments like Senator Inouye's merely demonstrate that Congress did not intend states to use the compacting process as a tool for regulating tribes generally.  Thus, as the Court stated previously, the State's request for mitigation measures is permissible so long as such measures directly relate to gaming operations or can be considered standards for the operation and maintenance of the Tribe's gaming facility.  See 25 U.S.C. § 2710(d)(3)(C)(vi)-(vii).  The State must offer concessions in exchange for its request.  The Tribe does not dispute that its gaming activities would take place in an environmentally-sensitive area.  Nor does it contend that its proposed gaming operations would be carried on without any negative environmental impact, thereby obviating the need for environmental mitigation measures.

Coyote Valley II supports the Court's conclusion.  There, the court held that a labor relations provision was a permissible topic of negotiation and could be included in a gaming compact because it directly related to gaming operations.  331 F.3d at 1116.  The court noted that the State did not insist on "general employment practices on tribal lands," but sought a labor relations provision that pertained to "employees at tribal casinos and related facilities."  Id. (emphasis in original).

In the alternative, the Tribe appears to argue that no environmental mitigation measure directly relates to gaming activities.  It again cites Rincon, where the court rejected as circular "the State's argument that general fund revenue sharing is

22

United States District Court
For the Northern District of California

'directly related to the operation of gaming activities' because
the money is paid out of the income from gaming activities . . . ."
602 F.3d at 1033.  The Ninth Circuit also cited 25 U.S.C.
§ 2710(d)(4), which limits the type of assessments for which a
state may negotiate under IGRA.  Rincon, 602 F.3d at 1033.  Big
Lagoon's reliance on these statements is misplaced.  The Rincon
court focused primarily on the direct taxation of tribes, which is
specifically identified and proscribed under IGRA.  See
§ 2710(d)(4) and (7)(B)(iii)(II).  IGRA does not treat
environmental mitigation measures similarly.

Still relying on Rincon, the Tribe also contends that
environmental protections are not consistent with the purposes of
IGRA.  However, the Rincon court did not address environmental
regulation.  Nor did it engage in a "potentially complicated
statutory analysis" to determine the metes and bounds of IGRA's
purposes because the State clearly misinterpreted Coyote Valley II
and the congressional intent underlying IGRA.  602 F.3d at 1034.
The court stated that the "only state interests mentioned in § 2702
are protecting against organized crime and ensuring that gaming is
conducted fairly and honestly."  Id. (emphasis in original).  It
did not, however, declare that environmental mitigation measures,
based on the location of a tribe's gaming facility, do not promote
IGRA's purposes.  Compliance with such measures does not run
counter to tribal interests.  Cf. S. Rep. 100-446, at 15 (1988),
reprinted in 1988 U.S.C.C.A.N. 3071, 3085 (stating that, in
considering good faith, the committee "trusts that courts will
interpret any ambiguities on these issues in a manner that will be

most favorable to tribal interests"). Thus, Big Lagoon does not establish that the State's proposed environmental mitigation measures are so discordant with IGRA's purposes that they amount to prohibited topics of negotiation.

This conclusion does not end the inquiry. As the Court has held, to negotiate for environmental mitigation measures in good faith, the State must offer a meaningful concession in exchange. See also Coyote Valley II, 331 F.3d at 1116-17 (explaining that the State's "numerous concessions" in exchange for a labor relations provision demonstrated that it did not act in bad faith). In its briefing, the State points to two: (1) the right to operate up to 349 gaming devices and (2) continued receipt of RSTF payments, even though Big Lagoon would no longer be a non-gaming tribe. However, the record of negotiations does not show that either of these offers was related to the proposed environmental mitigation measures; instead, they appear to have been offered in exchange for general fund revenue sharing. See Engstrom Decl., Ex. 9 at BL000915-17. Even if these purported concessions were connected to the request for environmental mitigation measures, the State does not satisfy its burden to show that they were meaningful. Without any context or comparison, the State simply declares that they were valuable. This is not sufficient.

Because the Court concludes that environmental mitigation measures are a permissible subject for negotiation under IGRA so long as they meet the definitions of § 2710(d)(3)(C)(vi) or (vii), the State could offer as a meaningful concession gaming rights that are more expansive than allowed to otherwise similarly situated

24

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   tribes.  The <u>Rincon</u> court noted, "In order to obtain additional

2   time and gaming devices, Rincon may have to submit, for instance,

3   to greater State regulation of its facilities or greater payments

4   to defray the costs the State will incur in regulating a larger

5   facility."  602 F.3d at 1039 (citing 25 U.S.C. § 2710(d)(3)(C)(i,

6   iii)).

7        In sum, the State may request environmental mitigation

8   measures so long as they (1) directly relate to gaming operations

9   or can be considered standards for the operation and maintenance of

10  the Tribe's gaming facility, (2) are consistent with the purposes

11  of IGRA and (3) are bargained for in exchange for a meaningful

12  concession.  Because it does not appear that the State offered a

13  meaningful concession in connection with its requests for

14  environmental mitigation measures, it thus far has failed to

15  negotiate in good faith.  This further supports summary judgment in

16  favor of Big Lagoon.

17                               CONCLUSION

18        For the foregoing reasons, the Court GRANTS the Tribe's motion

19  for summary judgment.  (Docket No. 80.)  The State's cross-motion

20  for summary judgment is DENIED.  (Docket No. 93.)

21        Pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), the Court directs

22  the Tribe and the State to conclude a compact within sixty days of

23  the date of this Order.  If they fail to do so, thirty days after

24  the expiration of the sixty-day period, Big Lagoon and the State

25  shall each submit a proposed compact to the Court, along with a

26  joint proposal for a mediator under 25 U.S.C. § 2710(d)(7)(B)(iv).

27  If the parties cannot agree on a mediator, they shall file separate

28

                                  25

proposals.

A further case management conference is set for March 8, 2011 at 2:00 p.m.

IT IS SO ORDERED.


Dated: 11/22/2010

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

# E X H I B I T B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BIG LAGOON RANCHERIA, a Federally
Recognized Indian Tribe,

           Plaintiff,

    v.

STATE OF CALIFORNIA,

          Defendant.

_____/

No. 09-01471 CW

ORDER DENYING
DEFENDANT'S
MOTION TO STAY
COURT'S NOVEMBER
22, 2010 ORDER
PENDING APPEAL
(Docket No. 102)

    Defendant State of California moves to stay the Court's
November 22, 2010 Order.  Plaintiff Big Lagoon Rancheria (Big
Lagoon on the Tribe) opposes the State's motion.  The motion was
taken under submission on the papers.  Having considered the papers
submitted by the parties, the Court DENIES the State's motion.

BACKGROUND

    Because the Court's Order of November 22, 2010 sufficiently
details the circumstances of this case, the Court focuses only on
those facts relevant to current motion.

    Over the past several years, Big Lagoon and the State have
engaged in negotiations for a tribal-state compact that would
permit the Tribe to conduct class III gaming.  On November 22,
2010, the Court concluded that the State failed to negotiate in
good faith and, accordingly, the Court granted the Tribe's motion
for summary judgment and denied the State's cross-motion for
summary judgment.  The parties were thereby ordered to begin, but
not complete, the remedial procedures set forth in the Indian
Gaming Regulatory Act (IGRA).  See generally 25 U.S.C.

§ 2710(d)(7)(B)(iii)-(vii).  In particular, the parties were

ordered to conclude a compact within sixty days of the Court's

order.  The Order provided that, if they were not able to do so,

the parties were to submit their preferred compacts to the Court,

along with a joint proposal for the mediator to be appointed under

25 U.S.C. § 2710(d)(7)(B)(iv).  If the parties could not agree on a

mediator, they were directed to file separate proposals.  The Order

did not instruct the parties to take any further action.

On December 9, 2010, the State filed a notice of its appeal of

the Court's November 22 Order.[1]  The same day, the State filed the

current motion to stay the Court's order.  The State apparently has

refused to engage in the process ordered by the Court.

## DISCUSSION

"A stay is not a matter of right, even if irreparable injury

might otherwise result."  Nken v. Holder, ___ U.S. ___, 129 S. Ct.

1749, 1760 (2009) (citation and internal quotation marks omitted).

Instead, it is "an exercise of judicial discretion," and "the

___

[1] It is not clear that the November 22 Order is appealable.
In Rincon Band of Luiseño Mission Indians v. Schwarzenegger, the
Ninth Circuit initially questioned its jurisdiction over the
State's appeal of the district court's summary judgment order, and
directed the State to show cause why its appeal should not be
dismissed for lack of jurisdiction.  See June 17, 2008 9th Cir.
Order to Show Cause, Rincon, No. 3:04-cv-01151-WMC (S.D. Cal.).
Thereafter, the district court issued an order, stating that all
claims in the action had been adjudicated.  Order of Jul. 1, 2008,
Rincon, No. 3:04-cv-01151-WMC (S.D. Cal.).  The Ninth Circuit
thereby discharged its order to show cause.  Here, judgment has not
entered and, as explained below, there are issues remaining to be
resolved.  Section 1291 of title 28 of the United States Code
provides appellate review of "final decisions of district courts."
"A 'final decisio[n]' is typically one 'by which a district court
disassociates itself from a case.'"  Mohawk Indus., Inc. v.
Carpenter, ___ U.S. ___, 130 S. Ct. 599, 604-05 (2009) (quoting
Swint v. Chambers Cnty. Comm'n, 514 U.S. 32, 42 (1995)).

United States District Court
For the Northern District of California

2

propriety of its issue is dependent upon the circumstances of the particular case." Id. (citation and internal quotation and alteration marks omitted). The party seeking a stay bears the burden of justifying the exercise of that discretion. Id.

"A party seeking a stay must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of relief, that the balance of equities tip in his favor, and that a stay is in the public interest."[2] Humane Soc. of U.S. v. Gutierrez, 558 F.3d 896, 896 (9th Cir. 2009); see also Perry v. Schwarzenegger, 702 F. Supp. 2d 1132, 1135 (N.D. Cal. 2010). The first two factors of this standard "are the most critical." Nken, 129 S. Ct. at 1761. Once these factors are satisfied, courts then assess "the harm to the opposing party" and weigh the public interest. Id. at 1762.

The State offers three reasons to argue that it is likely to prevail on appeal: (1) the Court erred by not permitting the State to conduct discovery into the legal status of the Tribe and its lands; (2) the Court erred in following the Ninth Circuit's decision in Rincon, 602 F.3d 1019 (9th Cir. 2010); and (3) the Court misapplied Rincon by requiring the State to offer meaningful

---

[2] An alternative to this standard is the "substantial questions" test, which requires the moving party to demonstrate "serious questions going to the merits and a hardship balance that tips sharply towards the plaintiff," along with a "likelihood of irreparable injury." Alliance for the Wild Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010) (internal quotation marks omitted); see also Golden Gate Rest. Ass'n v. City & Cnty. of S.F., 512 F.3d 1112, 1116 (9th Cir. 2008). However, as explained below, because the State does not demonstrate that it is likely to suffer irreparable harm at this time, the Court need not evaluate the State's request under this test.

concessions to obtain environmental protections and, even if such concessions were required, the State offered them.  In making these arguments, however, the State largely restates points it raised at summary judgment.  Thus, for the reasons set forth in the Court's November 22 Order, the State does not make a strong showing with respect to its likelihood of success on appeal.

The State asserts that it will face a likelihood of irreparable harm because it will be forced "to choose between offering compact proposals to Big Lagoon that do not serve the best interests of the people of California . . . or to decline to make any proposals whatsoever and suffer the prospect that the Secretary [of the Interior] will unilaterally impose procedures on the State that suit Big Lagoon's exclusive interests." Mot. 11.  The State is not currently faced with this choice.  This argument suggests only a possibility of future harm, which is not sufficient to justify staying the Court's order. Nken, 129 S. Ct. at 1761; Alliance for Wild Rockies v. Cottrell, 622 F.3d 1045, 1049 (9th Cir. 2010) (stating that, in the analogous context of seeking a preliminary injunction, a party "must establish that irreparable harm is likely, not just possible") (emphasis in original).  As noted above, the Court's Order only requires the parties to conclude a compact within sixty days and, if they fail to do so, to submit their competing compacts to the Court with a joint proposal, if possible, for a mediator.  At this time, the parties have not negotiated for sixty additional days, nor formulated their competing proposals.  Nor have they proposed a mediator or been

United States District Court
For the Northern District of California

4

ordered to submit any proposals to him or her.[3]

During the sixty-day process, the State shall negotiate with the Tribe and may agree, under protest, to a compact. If the parties conclude such a compact, the State, if it so chooses, may then renew its motion to stay. If the parties cannot agree, the parties shall submit their proposals to the Court, along with their joint or separate proposals for a court-appointed mediator. Again, the State's proposal will be deemed to be submitted under protest. Once the mediator's decision has been made, the State, if it so chooses, may renew its motion to stay. Because the Court has ordered only limited relief and because the State may renew its motion to stay at a later date, the harm of which the State complains remains speculative. The State offers no evidence or argument to show that it is likely to suffer irreparable harm based on the November 22 Order, which only directs the parties to continue their negotiations.

The State has not made a strong showing that it is likely to succeed on the merits, nor has it demonstrated that it is likely to suffer irreparable harm. Accordingly, the Court need not consider the harm to the Tribe and where the public interest lies. See Mount Graham Coal. v. Thomas, 89 F.3d 554, 558 (9th Cir. 1996).

CONCLUSION

For the foregoing reasons, the Court DENIES the State's motion

---

[3] Because the State apparently has not engaged in negotiations with the Tribe, no issue is raised by the recent change in the governorship. As stated below, the Court grants the parties an additional sixty days from the date of this Order to comply with its November 22 Order, which affords the newly-inaugurated governor an opportunity to formulate and express his position.

5

1   to stay the Court's November 22, 2010 Order pending its appeal.

2   (Docket No. 102.)   Accordingly, unless the State obtains a stay

3   from the Ninth Circuit, the parties shall negotiate to conclude a

4   compact within sixty days of the date of this Order.   If they fail

5   to do so, thirty days after the expiration of the sixty-day period,

6   Big Lagoon and the State shall submit their preferred compacts to

7   the Court, along with a joint proposal for a mediator.   If the

8   parties cannot agree on a mediator, they shall file separate

9   proposals.

10      The further case management conference, currently set for

11  March 8, 2011, is continued to May 10, 2011 at 2:00 p.m.

12      IT IS SO ORDERED.

13

14  Dated: 1/27/2011

15                                  CLAUDIA WILKEN
                                    United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

6